IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAT VINH MA d/b/a | § | |
| KDS NAIL PRODUCTS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| ACS NATURAL, LLC, | § | |
| | § | Jury |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT
AND REQUEST FOR INJUNCTIVE RELIEF**

NOW COMES Plaintiff, Dat Vinh Ma, d/b/a KDS Nail Products ("Plaintiff" or "KDS"),

and files his Original Complaint against Defendant ACS Natural, LLC ("Defendant" or "ACS"),

and shows the following:

## I.    NATURE OF THIS ACTION

1.    Plaintiff KDS is a world-recognized, leading manufacturer of high quality products

designed for use by beauty salons and spas in connection with, *e.g*., providing pedicures,

manicures, skin treatments including facials, and massages.  KDS has been providing theses salon

and cosmetic beauty care products throughout the U.S. and internationally since about August

1996 to present—about 22 years.

2.    Defendant ACS is providing inferior quality, low-priced products into this

marketplace that infringe, dilute and tarnish the superior trademark rights of KDS, unfairly

compete with KDS, tortuously interfere with KDS distributor business relationships and

irreparably cause harm to KDS.

3.      This is an action for false designation of origin, false descriptions, dilution, unfair competition and injunctive relief, arising under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051- 1127 regarding ACS's unauthorized use of KDS's trademarks.

4.      This is also an action for infringement of KDS's common law rights in its trademarks, for violation of the Texas anti-dilution statute for tortious interference with business relationships and for unfair competition.

5.      KDS possesses valid and enforceable superior trademark rights over ACS in connection with any use of the KDS Marks, as defined below.

## II.      **PARTIES**

6.      Plaintiff KDS is a California sole proprietorship of Dat Vinh Ma (a/k/a Daniel Ma), a U.S. Citizen, maintaining a principal place of business at 8580 Younger Creek Dr # A, Sacramento, CA 95828.

7.      Defendant ACS Natural, LLC is a Texas Limited Liability Company with its principal place of business at 10405 Rockley Road, Houston, Texas 77099, and may be served with process through its registered agent, Stephanie Le, 9615 Oxford Grove Drive, Houston, Texas, 77095.

8.      Defendant ACS is being sued in its common or assumed names for the purposes of assertion of Plaintiff's substantive rights.  On information and belief, Defendant ACS has also operated a business called American Cosmetic Supply, 807 NW 122nd Terrace, Newberry, Florida, 32669, and that this same address is used by other potentially related companies, including, Chem USA, and Chem Spa USA LLC that utilize overlapping officers and directors (Stephanie L. Le and Roger Tran-Son-Tay).  Plaintiff reserves its rights to seek to amend to add additional parties as may be warranted as discovery proceeds.

2

### III.    JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (Federal question), and 28 U.S.C. §1338(a) (Acts of Congress relating to trademarks).

10.     This Court has subject matter jurisdiction over the unfair competition claims under 28 U.S.C. § 1338(b).

11.     This Court has subject matter jurisdiction over the pendent Texas state law claims under 28 U.S.C. § 1367.

12.     Defendant is subject to personal jurisdiction by virtue of its contacts with the State of Texas, and with the Southern District of Texas in particular.

13.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendant resides in this district and is subject to the Court's personal jurisdiction with respect to this civil action in question, and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### IV.    PLAINTIFF'S KDS MARKS

14.     For over two decades, Plaintiff KDS (also known as KDS, KDS Nail Manufactory, KDS Nail International and KDS Nail Manufacturing) has been, and continues to be a world-recognized, leading manufacturer of high quality professional care products designed for use by beauty salons and spas in connection with, *e.g.*, providing pedicures, manicures, skin treatments, and massages.  These products include, for example, sugar scrubs (including natural, honey, milk & honey, lemon, orange, tangerine, chocolate, vanilla, coffee, coconut, cucumber, green tea, lavender, mint, olive, pomegranate, and rose varieties), body sprays, cream masks, skin creams and lotions, moisturizers, paraffin waxes, flower soaks, massage oils, nail glues, nail tips, nail

3

sealants, nail color gels, soak-off gel polishes, soaps, and liquid sun screens, among other products (collectively, the "KDS Products").

15.     KDS has always been committed to providing unique, high-quality salon and cosmetic beauty products and services to its clients worldwide.   KDS sells its KDS Products coast-to-coast throughout the U.S. and worldwide, primarily through a network of distributors carefully cultivated over the past 22 years.     KDS continuously advertises through its website www.kdsproducts.com (created in April 2009), through its network of distributors, and via high profile trade shows.   Over the past 22 years, KDS has invested heavily in the marketing and promotion of its KDS Products sold under its KDS Marks, via, e.g., its attendance at these trade shows—including expenses related to the preparation of a new booth each year (and related displays), use of paid promotional models, entertainment of distributors, and related travel, food and lodging.   KDS also sells directly to salons.   KDS has established numerous ongoing business relationships with its distributors and customers.   KDS's marketing and promotional expenses over the past 22 years have been approximately $150,000 per year—over three million dollars to-date.

16.     In connection with its distribution and sales of the KDS Products throughout the U.S. and internationally, since at least as early as July 1996 and continuing to present, KDS has used, *e.g.*, the following arbitrary or fanciful and inherently distinctive trademarks, in varying formats, on each of the KDS Products, product packaging, and in its advertising and promotional content and its website content:

    a.   the trademark "KDS"" ("the KDS Wordmark"), a mark that is arbitrary and distinctive. The KDS Wordmark has been continuously used by KDS in commerce on or in connection with its advertising, marketing, sales and distribution of salon and cosmetic beauty products since the beginning of KDS to present – about 22 years.

b.  the basic KDS logo ("the basic KDS Logo") (shown in grayscale without respect to any particular color, and used with differing colors, and also in the purple, red-hued color), a mark that is arbitrary and distinctive:



The basic KDS Logo style (in varying color combinations, particularly the purple, red-hued color shown above) has been continuously used by KDS in commerce on or in connection with its advertising, marketing, sales and distribution of salon and cosmetic beauty products since the beginning of KDS to present—about 22 years.

c.  the color KDS logo ("the color KDS Logo") a mark that is arbitrary and distinctive:



The color KDS Logo is highly distinctive and employs a purple (red-hued) brush stroke graphic behind the stylized white letters KDS outlined in black. This particular color combination on the KDS Logo has been used by KDS in commerce on or in connection with its advertising, marketing, sales and distribution of salon and cosmetic beauty products since the beginning of KDS to present—about 22 years.  Also, from time to time, KDS has used differing colors of the KDS Logo on particular products, such as green lettering and black brush stroke on its Jungle Mask product labels, and white lettering and black brush stroke on its Tangerine Mask product labels (*e.g.*, a black & white version of the logo).

d.  the original KDS website logo ("the original KDS Website Logo") a mark that is arbitrary and distinctive:

5



KDS created its domain name, www.kdsproducts.com on April 4, 2009 and thereafter uploaded content to this website ("the KDS Website") and provided an electronic point of sale display to permit purchases directly from its website. The original KDS Website Logo was used on the KDS Website from about April 2009 to about mid-to-late 2012 on or in connection with its advertising, marketing, sales and distribution of salon and cosmetic beauty products, when it was then replaced with the current KDS Website Logo format below.

e.  the current KDS website logo ("the current KDS Website Logo") a mark that is arbitrary and distinctive:



The current KDS Website Logo also adds a small blue earth graphic superimposed over the middle letter "D" and has been used by KDS on the KDS Website from about mid-to-late 2012 to present on or in connection with its advertising, marketing, sales and distribution of salon and cosmetic beauty products. The current KDS Website Logo format is also used from time to time directly on the KDS Product Labels or KDS Product packaging.

f.  the trademark "WHITE DIAMOND" ("the WHITE DIAMOND Wordmark") for hand, body and pedicure creams, a mark that is arbitrary and distinctive. KDS has used the

6

WHITE DIAMOND Wordmark in connection with its advertising, marketing, sales and distribution of salon and cosmetic beauty products since at least as early as 2005 to present.

g.  the trademark "NEW DIAMOND" ("the NEW DIAMOND Wordmark") and the related logo ("the NEW DIAMOND Logo"):



for sun screen liquid salon and cosmetic products.  KDS has used the NEW DIAMOND Wordmark and the NEW DIAMOND Logo in connection with its advertising, marketing, sales and distribution of salon and cosmetic beauty products since at least as early as 2008 to present.

h.  a prominently displayed flash video at the top of its webpage, kdsproducts.com, that features diamonds gently cascading downwardly on the screen, a mark that is arbitrary and distinctive.  A true and correct screen capture appears below ("The KDS Diamonds Screen"):



The KDS Diamonds Screen display has been active on the KDS Website since about mid-to-late 2012 to present; and

i.  a series of arbitrary and inherently distinctive product labels ("the KDS Labels") used by KDS on the KDS Product containers.  For example, on many of the KDS Products, the KDS Label features a woman in a bikini, often laying horizontally, but also in other modelling poses.  These KDS Labels are well known in the beauty supply market.  The KDS Products are relatively inexpensive, thus, typical KDS customers take less care in selecting the items.  Frequently, KDS customers (salon owners) often refer to the various KDS-brand products by the KDS Logo and the look of their specific labels, such as the "the sugar scrub product with the lady laying down" and also by reference to the color of the bikini, etc., such as "the sugar scrub with the lady laying down in the white bikini".  Sample copies of a few of the KDS Labels for some of the sugar scrub and sea salt manicure KDS Products are shown here, each also displaying the KDS Logo and KDS Wordmark:


(KDS label 1)


(KDS Label 2)



(KDS Label 3)

(KDS Label 4)

The exemplary KDS Labels 1-4 depicted above have been continuously used by KDS since about 2008 to present.

17.      KDS also uses a variety of other label styles, with unique graphic art.  For example, KDS sells a variety of honey sugar scrub products, each of which contains graphic art on the label depicting honey dripping from a honey dipper.  Additionally, KDS offers a product called Honey Sugar Scrub Milk that uses the following additional Honey Milk KDS Label:

 (KDS Label 5)

The honey dipper depiction shown above has been continuously used by KDS on various product labels for the last 5-6 years to present.

18.     According to Internic WHOIS data, the www.kdsproducts.com domain name was created on April 6, 2009.  KDS has maintained its commercial KDS Website since its launch in April 2009 to present.  Additional KDS Products, Product Labels and other promotional materials bearing the KDS Marks have been displayed throughout the KDS Website, along with numerous (currently eleven) Material Safety Data Sheets (MSDS) pertaining to the KDS Products from the time the website was launched to present.  A February 8, 2011 website archive of the KDS Website indicates that KDS had been deep in the professional beauty industry for over 15 years as of that time (*i.e*, about 22 years to present).  A June 17, 2012 website archive of the KDS Website shows the extensive products menu offered at that time along with a listing of the various trade show events attended by KDS at that time.

19.     The arbitrary and distinctive KDS Wordmark, basic KDS Logo, color KDS Logo, original KDS Website Logo, current KDS Website Logo, WHITE DIAMOND Wordmark, NEW DIAMOND Wordmark, NEW DIAMOND Logo, KDS Diamonds Screen, KDS Labels, a depiction of diamonds, a depiction of honey dripping from a honey dipper, and a depiction of a

posing woman wearing a bikini or a posing woman with exposed back, are collectively referred to herein as the "KDS Marks".

20.     KDS is, and at all relevant times has been, the owner of all right, title and interest in and to the KDS Marks, worldwide, including all related goodwill, under federal, state and common law.

21.     The KDS Marks enjoy widespread recognition, distinctiveness, popularity, and extremely valuable goodwill and serve to identify KDS as the source of these enormously successful salon and cosmetic beauty products.

22.     The intended use of the KDS Products requires that these products contact the human skin, nails or cuticles.  As such, and of utmost importance to KDS is that KDS maintains the highest standards of manufacturing quality.  These high standards of quality control ensure that KDS products, bearing the KDS Marks are of the highest quality—all supporting the valuable goodwill built up in the KDS Marks.

23.     KDS maintains rigorous quality control over its KDS Marks and KDS Products, including strict criteria regarding customer service and quality control standards. KDS maintains tight control over the use of its KDS Marks. The KDS Products customer base is very loyal and has been built over KDS's ~22 years in business and its reputation for providing high quality professional salon and cosmetic beauty products. KDS's promotion and development of the goodwill in its KDS Marks has been extensive and non-ending. The value of the KDS Marks can only be maintained by continuing the high-quality controls KDS maintains in all aspects of its operations.  In this connection, KDS provides pertinent MSDS available for review on its website. The KDS Website www.kdsproducts.com is typically displayed on the KDS Product Labels, and

a customer can also readily find Plaintiff's KDS Website by conducting an internet search for "KDS Nail".

24.     For about 22 years to present (or as otherwise noted above), KDS has at all relevant times continuously used in commerce, and continues to presently use in commerce, without interruption, the KDS Marks in diverse and customary ways in connection with the advertising, marketing, distribution and sale of the KDS Products, displaying its distinctive KDS Marks on, e.g., its website, on its KDS Labels (which are attached to the respective KDS Products), and on the packaging for the KDS Products.  For example, KDS applies the KDS Labels (bearing the KDS Marks) directly to the product containers, such as white buckets and the like and to the shipping boxes.

25.     KDS enjoys an excellent reputation for high quality salon and cosmetic beauty products, and has invested substantial time, toil, effort and financial resources to achieve such reputation, and to cultivate the extensive and highly valuable goodwill, distinctiveness and notoriety in its KDS Marks – goodwill that KDS has expensively and carefully built since 1996. KDS has also spent substantial time, effort and expense in extensively promoting the KDS Marks through its website, kdsproducts.com, via its network of distributors, and by frequently attending (with KDS booth display) world-wide salon and cosmetic beauty product trade shows each year, such as, for example, Cosmoprof North America.

26.     The KDS Marks are widely recognized by the general consuming public of the U.S., and internationally, as a designation of source of the goods or services of KDS, the owner of the KDS Marks.  Additionally, based on the high degree of inherent distinctiveness, arbitrariness, and notoriety in the KDS Marks, and in view of the duration, extent, and geographic reach of the advertising and publicity of the KDS Marks, the amount, volume and geographic extent of sales

of the KDS Products, and the extensive public recognition of the KDS Marks, the KDS Marks are famous marks indicating KDS as the source of the KDS Products.

27.     In view of the above, KDS has established superior legal rights under federal, state, and common law in its highly arbitrary, inherently distinctive and famous KDS Marks entitling the highly valuable KDS Marks to the highest level of protection and enforceability.

## V.     DEFENDANT ACS's WRONGFUL ACTIONS

28.     KDS recently discovered that ACS (a/k/a American Cosmetic Supply) is selling inferior quality, low-priced salon and cosmetic beauty products into the marketplace that infringe, dilute and tarnish the superior trademark rights of KDS, unfairly compete with KDS, tortuously interfere with KDS distributor business relationships and irreparably cause harm to KDS.

29.     For example, it had been recently discovered that ACS is marketing "knock-off" KDS products to one or more KDS distributors and on information and belief, others, using virtually identical marks, logos and labels at prices that would permit the KDS distributors (and others) to resell such products at much lower price points as compared to authentic KDS products, thereby permitting the resellers to usurp a higher profit all to the damage of KDS.

30.     ACS advertises on its website (www.americancosmeticsupply.com/) ("the ACS website" salon beauty products that compete directly with the KDS Products, including sugar scrub products.  ACS represents on its website that it can create personalized labels and can sell its products worldwide.  Of significance is the fact that nowhere on the ACS website does ACS market or display any of these infringing KTS products.  ACS does advertise on its website that it sells an essential oil called White Diamond—another instance of infringement of KDS's WHITE DIAMOND trademark.

31.     On information and belief, Texas Secretary of State records indicate that ACS was formed on 3/8/2012. Also, according to Internic WHOIS records, ACS's www.americancosmeticsupply.com domain name was created on 3/17/2013.

32.     Specifically, ACS is selling products, such as sugar scrub products, under the "KTS" brand in connection with a KTS logo that looks virtually identical to, and certainly confusingly similar with, the color KDS Logo and KDS Website Logo.  Furthermore, the ACS "KTS logo" is displayed on product labels that looks substantially similar to, and certainly confusingly similar with, the KDS Labels.  Also, the Defendant's mark "KTS" is strikingly similar to the Plaintiff's mark, "KDS" differing only in one letter.  Furthermore, this one-letter difference is a difference without any distinction – the terms KTS and KDS have a nearly identical look and sound when spoken, and therefore present a highly similar commercial impression and connotation.  Additionally, one such ACS product uses the identical "White Diamond" trademark.

33.     Infringing ACS products have been discovered, thus far, at one local Houston-area beauty supply company called JN Beauty Supply ("JN"), 12320 Bellaire Blvd, Houston, Texas 77072.  JN sells beauty products to local salons.   At least two different types of infringing ACS products have been discovered at JN:

KTS "White Diamond"               KTS "Milk & Honey"
Natural Sugar Scrub               Natural Sugar Scrub

14

34.     Both of these infringing ACS products bear a logo that is deceptively similar to the color KDS Logo and current KDS Website Logo.  When comparing the authentic color KDS Logo and current KDS Website Logo to the infringing KTS logo, it is clear that the logos are nearly identical, and certainly confusingly similar, for example:

 vs. 

Authentic                          "Knock-off"

35.     When casually viewing one of the ACS products bearing the KTS logo and KTS label, it is capable of being readily confused with authentic KDS Products.  The size and placement and overall look of the KTS logo on the ACS products (*e.g.*, 5-gallon bucket size) is very similar in nature to that of the authentic KDS logo used on the authentic KDS Labels on the same size buckets (see arrows).  For example:





KDS Product            ACS Product            KDS Product

Therefore, it is apparent that ACS designed the KTS logo and KTS labels to blend in and look like authentic KDS Product.

36.     Additionally, the KTS "Milk & Honey" label uses a very similar product name, and a virtually identical depiction of honey flowing off of a honey dipper, virtually identical in look and commercial impression to the authentic KDS Labels using this depiction of honey flowing off of a honey dipper (see arrows):



|              |              |
|:------------:|:------------:|
| KDS Label    | KTS Label    |

In fact, close inspection of the KTS "Milk & Honey" label on the right above exemplifies the "shoddiness" of the label, itself.  The bar code is blurred, and the word "children" in the lower right "warnings" section of the label is partially cut off.

37.     The KTS products described herein are also referred to as the infringing ACS or infringing KTS products.

38.     JN has been an authorized distributor of KDS Products for many years.  According to JN, JN was approached by Stephanie Le, one of the owners/officers of ACS, who convinced JN to purchase the ACS "knock-off" KDS products to pass off to salons as "KDS" products.  ACS offered these infringing products to JN at substantially reduced prices to permit JN to make more profit selling the infringing KTS products than by selling the authentic, higher-priced KDS Products, while nonetheless passing them off as KDS Products. The infringing KTS products are stocked right next to authentic KDS Products inventory at KN.

39.     JN was only able to resell these ACS products because they were branded to look like authentic KDS Product.  These infringing ACS products each contain a KTS logo that is virtually identical to the KDS Logo and KDS Website Logo except that it has changed one letter to read:  "KTS" instead of "KDS".  The KTS labels use a nearly identical red-hued brush stroke graphic behind the stylized white lettering with black outlines.  The letters "KTS" and "KDS" look and phonetically sound virtually identical – a virtually identical connotation and commercial impression.  The shape and placement of the blue diamond graphic on the KTS label is very similar to the shape and placement of the blue earth graphic on the current KDS Website Logo, and also conjures up the same commercial impressions and connotations created by the KDS Diamonds used in KDS's web advertising and online retail presence, and the KDS products called WHITE DIAMOND and NEW DIAMOND.  One of the KTS labels also uses the identical "White Diamond" trademark, and such mark appears on the ACS Website, thereby further associating and passing off the ACS product under multiple KDS trademarks.  Both of the infringing ACS sugar scrub products identified above also employ labels displaying similar depictions of "a lady laying down in white bikini" in the well-known style of the KDS Labels.  One of the KTS labels displays a depiction of honey flowing off of a honey dipper in virtually identical fashion to that displayed on one of the authentic KDS Labels.

40.     Given the highly similar name (KTS), logo and label style, JN believed that JN could sell these ACS products to salons who would believe they were purchasing authentic KDS product.

41.     Also, the highly similar nature of the KTS logo to the KDS logo, and the highly similar nature of the KTS labels to the KDS Labels, and the identical nature of the WHITE DIAMOND trademark also clearly indicates that Defendant ACS had knowledge of Plaintiff

17

KDS's products in the marketplace and consciously, intentionally and willfully set out to create deceptively similar "knock-off" products to confuse the public and to market and pass-off these products to KDS's customers and to induce KDS's distributors to do the same.

42.     Not only are these ACS infringing products likely to cause confusion, they have already caused actual confusion.   Recently, another of KDS's local Houston, Texas-area distributors received a return of product from a local Houston salon – a salon that typically purchased KDS Product from this distributor0.   According to this distributor, the salon owner returned the alleged KDS Product because it was of poor quality.   According to this distributor, the product appeared to be marketed under a different KDS White Diamond product label—one that this distributor had never seen before.   The KDS distributor nonetheless accepted the returned product from its salon customer, thinking it to be an authentic KDS Product. Thereafter, on about April 16, 2018, this distributor contacted Plaintiff, Mr. Ma to inquire if KDS had started selling new KDS Products directly to its Houston-area customers.   Plaintiff Mr. Ma replied to his distributor that KDS had not been selling products to its customers and asked this distributor to provide him with a photo of the product in question.   Upon initial review of the photo, although this sugar scrub product label looked highly similar to an authentic KDS Label and was displaying KDS's WHITE DIAMOND trademark, upon a close review of the photo received by KDS from this distributor on about April 16, 2018, it was discovered that the product label's logo actually stated KTS, not KDS.   Both the salon customer and the KDS distributor were confused by the KTS labels, thinking the product to be a KDS Product.   This distributor did not know where this infringing product originated as the label contained no identifying information as to the manufacturer other than to display a logo that looked almost identical to the color KDS Label.   An internet search for "KTS" or "KTS Spa" did not return any search results directed to any

manufacturer of salon and cosmetic beauty products. Upon Plaintiff's subsequent investigation in Houston, it was shortly thereafter determined to be an infringing product made by ACS.

43. Given that at least one salon owner returned the "shoddy" KTS product to a KDS distributor (believing it to be a KDS Product) and given that these ACS infringing products are not manufactured using the high standards of quality and safety employed by KDS, KDS will be irreparably harmed if this infringement continues. Furthermore, the potential exists for a user of the ACS infringing product to become harmed, and that such liability and resulting bad press will be initially directed toward KDS thereby damaging its reputation and the reputation of the KDS Marks.

44. Additionally, on information and belief, ACS has been selling these "knock-off" KTS products to others, all to the damage of KDS. ACS's intention is clearly to profit from the highly valuable goodwill established in the KDS Marks, and to damage the market share and reputation held by KDS.

45. ACS's use of the KTS mark, the KTS logo, the White Diamond mark and the KTS product labels are designations that are nearly identical with, or substantially indistinguishable from, the KDS Marks (the White Diamond mark being identical).

46. ACS has knowingly used these designations in connection with the advertisement, promotion, sale, offering for sale and provision of salon and cosmetic beauty products in direct competition with KDS.

47. ACS's unauthorized use of the KTS mark, the KTS logo, and the KTS product labels are likely to cause confusion, or cause mistake, or to deceive as to the affiliation, connection or association of these "KTS" salon and cosmetic beauty products with the KDS Products.

48.     ACS's unauthorized use of the KTS mark, the KTS logo, and the KTS product labels are likely to cause confusion, or cause mistake, or to deceive as to the origin, sponsorship, or approval of its goods, services, or commercial activities.

49.     ACS has falsely designated, falsely or misleadingly described, and falsely or misleadingly represented that its beauty salon products are sponsored by, are approved by, or are associated with KDS and the KDS Marks when in fact they are not.

50.     ACS has in the past and is presently advertising and promoting its business in this district by discreetly marketing its infringing products through, among other channels, local salon and beauty supply companies (if not nationwide and international beauty supply companies).   The fact that ACS does not advertise its "KTS" line of products on its website speaks volumes.  ACS is trying to hide these products from detection by KDS while it sets out to deceive and unfairly compete.

51.     Because of ACS's unauthorized activities associated with the KTS mark, the KTS logo, and the KTS product labels, ordinary customers are likely to believe that ACS's goods are affiliated, connected or associated with KDS when they are not.

52.     Because of ACS's unauthorized activities associated with the KTS mark, the KTS logo, and the KTS product labels, ordinary customers are likely to believe that ACS's goods and services are authorized, sponsored or otherwise approved by KDS when in fact they are not.

53.     ACS's commercial advertising or promotion referenced above, including ACS's under the table dealings with at least one KDS distributor, and on information and belief, other distributors and/or salons, misrepresents the nature, characteristics, qualities, or geographic origin of ACS's goods, services, and/or commercial activities.

54.     Because of ACS's unauthorized commercial advertising and promotional activities associated with the KTS mark, the KTS logo, and the KTS product labels, ordinary customers are likely to believe that ACS's goods, services and commercial activities originate with KDS, are sponsored by KDS, are authorized, sponsored or otherwise approved by KDS when in fact they are not.

55.     This likelihood of confusion causes irreparable harm to KDS and weakens the distinctive quality of the KDS Marks.

56.     ACS is not now and has never been authorized by KDS to use the KDS wordmark, the KDS Logo, and the KTS Labels, a depiction of diamonds, a depiction of honey dripping from a honey dipper, and a depiction of a posing woman wearing a bikini or a posing woman with exposed back, or any confusingly similar trademark, such as the KTS mark, the KTS logo, and the KTS product labels, in connection with the its offering, selling, or distributing of its salon and cosmetic beauty products.

57.     ACS's actions were deliberately calculated to capitalize on the extensive goodwill established by KDS in the distinctive KDS Marks.

58.     ACS is not now, nor has it ever been, associated, affiliated or connected with, or endorsed or sanctioned by ACS.

59.     At all relevant times, ACS has been aware of KDS and the KDS Products, and KDS Marks, and KDS's superior rights in and priority of use of those marks.  ACS's infringement and other unlawful actions were therefore undertaken willfully and intentionally, and with an intention to profit from KDS's well established, valuable goodwill in the KDS Marks, to dilute the distinctiveness of the KDS Marks, and to tortuously interfere with the contractual and business relationships between KDS and its distributors.

60.     KDS has been and continues to be irreparably injured by KDS's continued unlawful acts.

61.     By using infringements of the KDS Marks in connection with ACS's salon and cosmetic beauty products, ACS is trading on the goodwill and reputation of KDS and creating the false impression that ACS's salon and cosmetic beauty products are KDS's legitimate products.

62.     ACS has been unjustly enriched by illegally using and misappropriating KDS's intellectual property for ACS's own financial gain.

63.     Furthermore, ACS has unfairly benefited and profited from KDS's outstanding reputation for high quality products and KDS's significant advertising and promotion of salon and cosmetic beauty products under the KDS Marks.

64.     ACS has disparaged KDS, its KDS Marks and its KDS Products by creating a false association with KDS, KDS's genuine products and the KDS Marks and by manufacturing poor quality product designed to damage the reputation of KDS's business and disparage and tarnish the KDS Marks.

65.     KDS has had no control over the nature and quality of the salon and cosmetic beauty products sold by ACS in connection with the infringing use of the KDS Marks.

66.     Among other things, ACS's distribution, sale, offers of sale, promotion and advertisement of its salon and cosmetic beauty products has reflected adversely on KDS as the believed source of origin thereof, has hampered continuing efforts by KDS to protect its outstanding reputation for high quality, original and distinctive services and salon and cosmetic beauty products, has diluted the KDS Marks, and has tarnished the goodwill and demand for genuine KDS salon beauty products and will continue to do so without intervention of this court.

67.     ACS has acted with reckless disregard for KDS's rights.

68.     ACS has willfully and maliciously engaged in its infringing activities, tortious interference with business relationships and unfair competition regarding its unlawful use of the KDS Marks.

69.     As a result of the foregoing, this case constitutes an exceptional case under 15 U.S.C. § 1117(a).

70.     KDS has suffered irreparable harm and damages as a result of the acts of ACS in an amount thus far not determined.

71.     The injuries and damages sustained by KDS have been directly and proximately caused by KDS's wrongful advertisement, promotion, distribution, sale and offers of sale of its salon and cosmetic beauty products bearing infringements of the KDS Marks.

72.     KDS has no adequate remedy at law.

73.     KDS has also actively contributed to, induced, supported, sponsored, and profited from its distributors' unauthorized use of infringements of the KDS Marks.

74.     ACS's wrongful acts will continue unless enjoined by the Court. Accordingly, ACS must be restrained and enjoined from any further infringement of the KDS Marks.

75.     KDS is entitled to injunctive relief against ACS – a temporary restraining order, a preliminary injunction and a permanent injunction.  As set out above, the KDS Marks are eligible for strong trademark protection and KDS possesses superior trademark rights over ACS. A likelihood of confusion exists for the factual reasons set out above, including:  (a) the type of the mark involved (here, the KDS Marks are arbitrary, strong and inherently distinctive), (b) the similarity of the marks (as evidenced above, they are highly similar, or identical), (c) the similarity of the goods (as evidenced above, they are highly similar or identical), (d) the similarities in the retail outlets and purchasers, (e) the advertising media used (including use of internet web content

and direct marketing to distributors), (f) ACS's intent to deceive (ACS's intent to capitalize on the success of the KDS Products as evidenced above and its intentional interference with JN as evidenced above), (g) the evidence of actual confusion, and (e) the degree of care exercised by potential purchasers.

76.     The harm to KDS caused by the acts of ACS complained about herein is imminent and probable, the injury irreparable, and KDS has no other adequate legal remedy.  The damages sustained by KDS are unpredictable and unending, and difficult to calculate and include the substantial threat of loss of the goodwill and the value of its KDS Marks, loss of clientele, loss of marketing techniques, loss of control over the quality of ACS's products, loss of ability to control its image, loss of the benefits of its substantial financial investments in KDS over the last ~ 22 years, harm to its reputation, and dilution of the strength of its marks.  Because of the uncertain nature of the damages, Plaintiff has no adequate remedy at law.

77.     The harm KDS will suffer without an injunction outweighs any harm to ACS if the injunction is granted. KDS has made substantial investments in its KDS Products and KDS Marks over the last ~22 years.  ACS has its own "ACS" brand to use, and this request for injunctive relief does not prevent ACS from continuing to use its ACS mark, so long as it does not use any of KDS's proprietary rights. The potential damage to the goodwill and value of the KDS Marks is far outweighed by the inconvenience and relatively inexpensive costs for Defendant ACS to discontinue use of the KTS infringements, and to recall prior KTS branded product and to replace labels on existing inventory and replace other items bearing the infringing marks.  These expenses to Defendant ACS would not be significant.  The potential damage to Plaintiff KDS, however, is significant.  Any irreparable harm suffered by Plaintiff KDS would outweigh any hardship that an injunction would cause to Defendant ACS.

78.     Furthermore, KDS's rights to control the quality of cosmetic products for use on humans that are branded with its KDS Marks (or infringements thereof) will not disserve the public interest.  Furthermore, the public's interest in preserving the trademark rights of KDS and avoiding confusion outweigh the public's potential interest in having two companies offering the same branded products.  Protecting our valid and strong rights in our KDS Marks from infringement by a junior user, ACS, would not disserve the public interest.  An injunction in this case would not prohibit Defendant ACS from continuing its manufacturing operations under non-infringing trademarks.

<u>**COUNT I – FALSE DESIGNATIONS OF ORIGIN,<br>FALSE DESCRIPTIONS AND REPRESENTATIONS**</u>
(15 U.S.C. § 1125(a), § 43(a) of the Lanham Act)

79.     KDS hereby incorporates all prior allegations by reference.

80.     This is an action under the Lanham Trademark Act of 1946 (15 U.S.C. § 1051, et seq.), particularly, 15 U.S.C. § 1125(a) for false designation of origin, false or misleading descriptions and representations of fact and dilution based on ACS's wrongful appropriation and use of the KDS Marks.

81.     In connection with ACS's advertisement, promotion, distribution, sales and offers of sales of its salon and cosmetic beauty products and related services, and is support of its network of distributors, ACS has used in commerce, and continues to use in commerce, infringements of KDS's distinctive KDS Marks.

82.     In connection with ACS's advertisement, promotion, distribution, sales and offers of sales of its salon and cosmetic beauty products and related services, ACS has affixed, applied and used false designations of origin and false and misleading descriptions and representations, including infringements of the KDS Marks, which tend falsely to describe the origin, sponsorship,

association or approval by KDS of the salon and cosmetic beauty products and related services ACS sells and provides and/or misrepresent the nature, characteristics, qualities or geographic origin of the goods, services or commercial activities of KDS and ACS.

83.     ACS has used the infringements of the KDS Marks with full knowledge of the falsity of such designations of origin, descriptions and representations, all to the detriment of KDS. ACS has induced and encouraged its distributors to do the same.

84.     ACS's use of the infringements of the KDS Marks on its product containers provided to its network of distributors or to salons, and in connection with its provision of salon and cosmetic beauty products constitutes false descriptions and representations tending falsely to describe or represent ACS and ACS's products as being authorized, sponsored, affiliated or associated with KDS.

85.     ACS has used the infringements of the KDS Marks on its product containers, in communications with its network of distributors and salon customers and in connection with its provision of salon beauty products, with the express intent to cause confusion and mistake, to deceive and mislead the public, to trade upon the reputation of KDS and to improperly appropriate to itself the valuable trademark rights of KDS.

86.     ACS's acts constitute the use in commerce of false designations of origin and false or misleading descriptions or representations, tending to falsely or misleadingly describe or represent Defendants' products as those of KDS in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).   ACS is likewise secondarily liable for the similar unlawful acts of its distributors.

87.     Because of ACS's unlawful acts, KDS is entitled to an award of ACS's profits, any damages sustained by KDS, and the costs of the action.

88.     This is an exceptional case.

89.     Because of the willful nature of ACS's wrongful acts, KDS is entitled to enhanced damages not exceeding a trebling of the damages and profits awarded along with reasonable attorney's fees, investigative fees and pre-judgment interest pursuant to 15 U.S.C. § 1117(b).

90.     Based on ACS's unlawful acts regarding the infringements of the KDS Marks, and for the reasons set out above, KDS is entitled, under the principles of equity, to an injunction against ACS prohibiting any further violation of KDS's trademark rights in the KDS Marks.  15 U.S.C. § 1116(a).

91.     By reason of the acts of ACS alleged herein, KDS has suffered, is suffering and will continue to suffer irreparable damage and, unless ACS is retrained from continuing these wrongful acts, the damage to KDS will increase.

92.     KDS has no adequate remedy at law.

93.     Also based on ACS's unlawful acts alleged above, its false designations of origin, false or misleading descriptions of fact, and false or misleading representations of fact, KDS is also entitled to have the court order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of ACS, bearing the registered mark or the word, term, name, symbol, device, combination thereof, designation, description, or representation that is the subject of the violation, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up and destroyed.

94.     Additionally, because of the aforementioned wrongful acts, and unless enjoined by the court, KDS will suffer a probable injury.  ACS's activities create a substantial threat of irreparable harm to KDS's reputation, trademark goodwill, brand name, trademark quality control, business expansion and image, and this threat is imminent.  KDS has no other adequate legal

remedy.  The damages sustained by KDS would be unpredictable and unending, and difficult to

calculate, and would include loss of goodwill, loss of clientele, loss of marketing techniques, loss

of control over quality, loss of ability to control its image, loss of ability to expand its marketplace,

loss of the benefits of its substantial financial investment, and damage to the strength of its KDS

Marks.  The injury to KDS is of the type where KDS cannot be adequately compensated for it in

money, or where the amount of money due to KDS cannot be measured by any certain standard.

      95.    ACS's actions create a substantial threat to KDS's goodwill and brand name built

up over the last approximately 22 years, and at a significant expense to KDS.  KDS's consumer

goodwill and widely recognized KDS Marks and trade name cannot be quantified and as a

consequence, the damage caused thereto by ACS's unlawful acts cannot adequately be

compensated by monetary damages.  Calculation of such damages to KDS as a result of consumer

confusion is difficult, if not impossible, to measure with dependable certainty.  Without injunctive

relief, there exists a substantial threat of imminent, irreparable harm to KDS.  KDS is entitled to

injunctive relief in that it has pleaded, and the facts establish, causes of action against ACS; a

probable right to the relief sought; and a probable, imminent, and irreparable injury.

      96.    Such injunction may include a provision directing ACS to file with the court and

serve on KDS within thirty days after the service on ACS of such injunction, or such extended

period as the court may direct, a report in writing under oath setting forth in detail the manner and

form in which ACS has complied with the injunction.

      97.    Based on ACS's acts of trademark infringement, KDS is also entitled to have the

court order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements, in

any format, in the possession of ACS, bearing the mark or the word, term, name, symbol, device,

combination thereof, designation, description, or representation that is the subject of the violation,

or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up and destroyed.

## COUNT II – DILUTION
(15 U.S.C. § 1125(c), § 43(c) of the Lanham Act)

98.     KDS hereby incorporates all prior allegations by reference.

99.     This is also an action under 15 U.S.C. § 1125(c) for dilution of the famous KDS Marks.

100.    As set out above, the distinctive KDS Marks are famous trademarks under 15 U.S.C. § 1125(c).

101.    As set out above, the KDS Marks are widely recognized by the general consuming public of the U.S., and internationally, as a designation of source of the goods or services of KDS, the owner of the KDS Marks.  The KDS Marks possess the requisite degrees of recognition as evidenced by the following factors:  the duration, extent, and geographic reach of advertising and publicity of the marks, whether advertised or publicized by KDS or third parties; the amount, volume, and geographic extent of sales of goods or services offered under the marks; and the extent of actual recognition of the marks.

102.    At a time well after the KDS Marks became famous, ACS commenced use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous KDS Marks, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

103.    ACS has been pervasively using nearly identical marks, the KTS wordmark, the KTS logo, the KTS labels, the dripping honey from a honey dipper, the White Diamond Wordmark (identical), and encouraging one or more of its distributors to do the same.

104.     ACS has been engaging in dilution by blurring by virtue of the association arising from the similarity between ACS's use the KTS wordmark, the KTS logo, and the KTS labels and KDS's famous KDS Marks that impairs the distinctiveness of KDS's famous KDS Marks.  ACS's use of the KTS wordmark, the KTS logo, and the KTS labels is likely to cause dilution by blurring based on relevant factors, including:  the degree of similarity between ACS's use of the KTS wordmark, the KTS logo, and the KTS labels and KDS's famous KDS Marks; the high degree of inherent distinctiveness of KDS's famous KDS Marks; the high degree of recognition of KDS's famous KDS Marks; ACS's intent to create an association with KDS's famous KDS Marks; and the actual association created between ACS's use of the KTS wordmark, the KTS logo, and the KTS labels and KDS's famous KDS Marks.

105.     By reason of dilution by blurring, ACS willfully intended to trade on the recognition of KDS's famous KDS Marks.

106.     ACS has also been engaging in blurring or dilution by tarnishment by virtue of the association arising based on the similarity of ACS's reference to the KTS wordmark, the KTS logo, and the KTS labels and KDS's famous KDS Marks that harms the reputation of the famous KDS Marks.

107.     By reason of dilution by tarnishment, ACS willfully intended to harm the reputation of KDS's famous KDS Marks.

108.     Because KDS has a statutory right to an injunction, KDS is not required to prove it has no adequate remedy at law.

109.     Based on ACS's willful acts of dilution by blurring or dilution by tarnishment, ACS is liable to KDS for:  (a) an award of ACS's profits, (b) any damages sustained by KDS, and (c) the costs of the action.  ACS is also secondarily liable for the similar acts of its distributors.

110.    Based on ACS's dilution by blurring or dilution by tarnishment of the famous KDS Marks, and for the reasons set out above, KDS is entitled, under the principles of equity, to an injunction against ACS prohibiting any further dilution regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.  15 U.S.C. §§ 1116(a); 1125(c).

111.    Based on ACS's willful acts of dilution by blurring, KDS is also entitled to have the court order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of ACS, bearing the word, term, name, symbol, device, combination thereof, designation, description, or representation that is the subject of the violation, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up and destroyed.

### COUNT III - INFRINGEMENT OF COMMON LAW TRADEMARK RIGHTS AND INJURY TO BUSINESS REPUTATION AND DILUTION

112.    KDS hereby incorporates all prior allegations by reference.

113.    KDS, by adoption and use in this district and elsewhere throughout the U.S. and internationally for about the last 22 continuous years (or as otherwise stated), has acquired significant, enforceable and superior common law rights in its well-known and famous KDS Marks and KDS tradename on or in connection with the manufacturing, advertising, offering, selling, or distributing of salon beauty products, including its color KDS Logo, WHITE DIAMOND trademark, the depictions of diamonds, the depictions of honey dripping from a honey dipper, and the depictions of a posing woman wearing a bikini or a posing woman with exposed back, as a name, mark, or source identifier for its salon and cosmetic beauty products (including on its KDS Labels).  ACS has unlawfully appropriated and is attempting to use in this district and elsewhere infringements of the KDS Marks, including the exact WHITE DIAMOND trademark belonging

to KDS, and a nearly identical depiction of honey dripping from a honey dipper on one of the KTS labels, a nearly identical depiction of the color KDS Logo and KDS Wordmark, and highly similar depictions of a posing woman wearing a bikini or a posing woman with exposed back without right or permission from KDS.  ACS is inducing, contributing to, encouraging and supporting similar unlawful acts by on or more of its distributors, and is tortuously interfering with KDS's business relationships with one or more of KDS's distributors.

114.    ACS has appropriated for its own use with similar goods, services and commercial activities, virtually identical trademarks (the KTS wordmark, KTS logo, White Diamond wordmark and KTS labels (including depictions of honey dripping from a honey dipper, depictions of the color KDS Logo and KDS Wordmark, and highly similar depictions of a posing woman wearing a bikini or a posing woman with exposed) to that of the KDS Marks.  Such illegal use is likely to cause confusion or to cause mistake.  KDS's arbitrary and distinctive KDS Marks are entitled to significant protection.  ACS offers, sells and distributes its products and related services to the same customers within the same stream of commerce used by KDS.  ACS's actions have been willful, wanton and carried out with an express intent to injure the business of KDS.

115.    Because of the aforementioned acts of common law trademark infringement, and common law trade name infringement, KDS is entitled to injunctive relief and an award of its actual damages resulting from ACS's illegal conduct.  Due to the brazen, willful and wanton nature of ACS's conduct, KDS is also entitled an award of enhanced, punitive damages.

116.    ACS's wrongful conduct alleged herein also violates the Texas anti-dilution statute regarding injury to business reputation and dilution of a trade name or mark pursuant to Section 16.001 et seq. of the Texas Business and Commerce Code.  The KDS Marks are widely recognized by the public throughout this state, and for the reasons exemplified herein, are famous marks. At

a time well after the KDS Marks became famous, ACS began unlawful commercial use of the infringements of the KDS Marks.  ACS's wrongful conduct is likely to cause dilution of KDS's famous marks.  ACS's unlawful acts have caused dilution by blurring by creating an association arising from the similarity between its references to the KTS wordmark, the KTS logo and the KTS labels and KDS's famous KDS Marks that impairs the distinctiveness of KDS's famous KDS Marks.  ACS's unlawful acts have caused dilution by tarnishment by creating an association arising from the similarity between its references to the KTS wordmark, the KTS logo and the KTS labels and KDS's famous KDS Marks that harms the reputation of KDS's famous KDS Marks.  These acts violate the Texas anti-dilution statute.  The damages sustained by KDS would be unpredictable and unending, and difficult to calculate, and would include loss of goodwill, loss of clientele, loss of marketing techniques, loss of control over quality, loss of ability to control its image, loss of the benefits of investment, and dilution of the strength of its marks thereby entitling KDS, under the principles of equity, to injunctive relief under section 16.103.

## COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

117.    KDS hereby incorporates all prior allegations by reference.

118.    As set out above, Plaintiff KDS has spent millions of dollars in developing the goodwill associated with its KDS Marks with its customers, with its distributors and their respective customers.  KDS has established numerous ongoing business relationships with its network of distributors, including KN, and has a reasonable expectation that such distributors will continue to sell authentic KDS Products to their customers desiring KDS Products.  Defendant ACS is presently engaged in direct interference with the business relationships between KDS and at least one of KDS's distributors, if not, on information and belief, more of them.  As alleged above, ACS approached and convinced KN, one of KDS's distributors, to sell the infringing KTS

"knock off" products offered at discounted prices by ACS and to pass off these KTS products as authentic KDS products to permit JN to realize a higher profit than when selling authentic KDS Products.  ACS seeks to trade on KDS's existing distributor relationships by infringing the KDS Marks and thereby preventing the ongoing KDS distributor relationships to continue without interference.

119.   ACS has been interfering with one or more of KDS's distributors in a manner calculated to cause harm to KDS.  ACS has been wrongfully and illegally using infringements of the KDS Marks on at least two, if not more, salon and cosmetic beauty products, and offering and selling these infringing products to at least one, if not many more, of KDS's existing distributors at discounts designed to tempt the distributor to pass off such ACS products as authentic KTS Products and thereby realize a higher profit.  ACS is unlawfully competing with KDS and infringing the KDS Marks by offering and selling to one or more KDS distributors, branded product that ACS is not legally entitled to offer and sell.

120.   KDS has enjoyed a long-standing existing business relationship with JN and its other distributors who were engaged in reselling authentic KDS Products.  Therefore, there exists a reasonable probability that JN (and on information and belief other distributors contacted by ACS) would have continued to purchase only authentic KDS Products to sell to its customers desiring KDS Products.  ACS's use of KTS infringing products and its inducement of infringement with discounted prices prevented KDS's distributor JN (and on information and belief other KDS distributors) from making additional sales of authentic KDS Products to those customers receiving the "knock-off" KTS products thereby interfering with the ongoing relationship KDS enjoyed with its distributor JN (if not others).   ACS did such acts with a conscious desire to prevent the further ongoing sales of authentic KDS Products by JN (or, on information and belief, other distributor

relationships of KDS) or otherwise knew that the interference was certain or substantially certain to occur as a result of ACS's conduct.

121.    ACS's wrongful activities have been intentional and malicious in its manner of intervening into the existing business relationships of KDS.  On information and belief, ACS expressly knew that JN was a distributor of KDS Products given that JN stocks many of the authentic KDS Products in its Houston location, and given that ACS specifically marketed its infringing KTS products as being designed to be passed off as authentic KDS Products.  ACS has no legal justification or excuse for such blatant, malicious interference – carrying out its unlawful and intentional acts of trademark infringement and of inducing KDS distributors to sell the same, without any just cause or excuse.  ACS's actions evidence a specific intent to cause substantial harm to KDS.   As a consequence of ACS's interference, KDS has suffered actual damages, harm or loss.

122.    KDS is entitled to an award of actual damages, unjust enrichment as a measure of lost profit damages, exemplary damages and seeks a TRO, preliminary and permanent injunction against such further unlawful activity.

## COUNT IV - COMMON LAW UNFAIR COMPETITION

123.    KDS hereby incorporates all prior allegations by reference.

124.    As set out above, ACS's infringing use of the KDS Marks in connection with its business activities constitutes an unlawful appropriation of KDS's exclusive rights in and to its KDS Marks and such unauthorized use has caused and will continue to cause damage and irreparable injury to KDS.  ACS has likewise encouraged and induced at least one, if not more, of its distributors (at least one of which is also a long-standing KDS distributor) to make similar use of infringements of the KDS Marks to pass off the KTS products as being authentic KDS Products

when they are not.  These actions also tortuously interfere with KDS's business relationships with its distributors.

125.    ACS's infringing use of the KDS Marks in connection with its business activities has and will damage KDS by leading the trade and public to believe that the salon beauty products and related services offered by ACS are approved or sponsored in this district and elsewhere by KDS. Such unauthorized use of the KDS Marks or variants thereof (such as the KTS wordmark, the KTS logo, the White Diamond wordmark and the KTS labels, including the labels depicting diamonds, depicting honey dripping from a honey dipper, and depicting a posing woman wearing a bikini or a posing woman with exposed back) will continue to cause injury to the KDS Marks, all of which constitute irreparable harm to KDS.

126.    ACS's intentional use of the infringing variants of the KDS Marks to mislead and confuse the public constitutes unfair competition as does ACS's attempts to trade on KDS's goodwill by passing off goods or services as being associated with those of KDS, and ACS's interference with KDS's business relationships.

127.    ACS's conduct complained of herein is contrary to honest practice in industrial or commercial matters. Based on the evidence of record, the tortious conduct of ACS has interfered with KDS's ability to conduct its business, to the great damage of KDS, and constitutes unfair competition.  ACS's illegal use of the substantially similar variants of the KDS Marks (including the identical White Diamond mark) in connection with its intentional efforts to offer and sell salon and cosmetic beauty products is designed to injure KDS.  ACS is illegally using infringements of the KDS Marks in its marketing and sales campaigns throughout Houston and, on information and belief, many other locations within and without the U.S., in an illegal attempt to unfairly compete

with KDS and to tortuously interfere with KDS's distributors. ACS's unfair competition was willful and deliberate and entitles KDS to enhanced damages.

128.    Unless enjoined by this Court, ACS will continue to unfairly compete with KDS by unfairly trading upon KDS's valuable goodwill and reputation in its KDS Marks.

129.    The actions of ACS complained of herein constitute unfair competition and have resulted in damages to KDS in an amount exceeding the minimum jurisdictional limits of this Court.  Additionally, as a result of the willful and deliberate nature of ACS's unlawful activities, KDS is entitled to punitive and exemplary damages.

## **JURY DEMAND**

130.    KDS hereby demands a trial by jury.

## **PRAYER**

**WHEREFORE,** the Plaintiff, KDS, respectfully requests the following relief:

A.    Granting a temporary restraining order, preliminary injunction and permanent injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116, and Section 16.103 of the Texas Business and Commerce Code Texas common law preliminarily and permanently restraining and enjoining Defendant, its related companies, and its agents, distributors, employees, officers, directors, members, attorneys, successors and assigns, and all those persons in active concert or participation with each or any of them, from:

1.    directly or indirectly using the KTS wordmark, the KTS logo or the KTS labels, or anything confusingly similar thereto;

2.      directly or indirectly using a mark or tradename whose similarity to any of the KDS Marks impairs the distinctiveness of the KDS Marks, including, the KTS wordmark, KTS logo and the KTS labels;

3.      directly or indirectly using the trademark WHITE DIAMOND, or depictions of diamonds, in connection with the offering, marketing, selling and distributing of salon and cosmetic beauty products;

4.      directly or indirectly using a depiction of honey dripping from a honey dipper in connection with the offering, marketing, selling and distributing of salon and cosmetic beauty products;

5.      directly or indirectly using any depiction of a woman on a salon cosmetic product label for skin, nail, or cuticle products, pedicure or manicure products where the woman is wearing a bikini, or being depicted topless from the back;

6.      using any trademarks, trade names, designs, caricatures and/or service or product identifiers that are confusingly similar to any of KDS's trademarks, trade names and/or other indicia, including any of the KDS Marks, in any manner, and/or are likely to cause confusion or mistake with respect to KDS and/or its goods and services;

7.      directly or indirectly using any trademarks, trade names, designs, caricatures and/or service or product identifiers that are confusingly similar to any of KDS's trademarks, trade names and/or other indicia, including any of the KDS Marks, in any manner, and/or are likely to cause confusion or mistake with respect to KDS and/or its goods and services;

8.      directly or indirectly using the KTS wordmark, the KTS logo and the KTS labels on signage, labels, social media sites, websites, marketing materials (printed or electronic), on uniforms, on website advertisements, packaging, invoices, purchase orders, products,

38

product containers, or on any other form used in connection with the provision of salon and cosmetic beauty products;

9.      otherwise engaging in any other acts or conduct which would cause consumers in the relevant trade to erroneously believe that ACS's goods or services are somehow sponsored by, authorized by, licensed by, or in any other way associated with KDS;

10.     falsely advertising, directly or indirectly, ACS's services and products;

11.     engaging in any other activity constituting unfair competition with KDS, or acts and practices that deceive consumers, the public, and/or trade;

B.      Directing that ACS, within ten (10) days of Judgment or other Order, take all steps necessary to permanently remove from all websites, social media sites, signage, product labels, product containers, product packaging, advertising media, photographs, and the like making reference to the KDS Marks or a design or mark looking substantially similar thereto, including the KTS wordmark, the KTS logo, the White Diamond trademark, depictions of diamonds, depictions of honey dripping from a honey dipper, a depiction of diamonds, depictions of a posing woman wearing a bikini or a posing woman with exposed back and the KTS labels with respect to salon and cosmetic beauty products;

C.      Directing that ACS, within ten (10) days of Judgment or other Order, take all steps necessary to issue a product recall of all product sold or otherwise distributed under the KTS label; to issue a statement to each such purchaser that the recalled product was not authentic KDS product and that ACS shall refund each customer in full who purchased such KTS labelled products; and to provide to KDS and the Court a written inventory of all such KTS labelled products ever manufactured, sold or distributed by ACS (including the customers who purchased the same) along with evidence showing how ACS complied with the recall;

D.     That ACS be ordered to pay to KDS such damages as KDS has sustained as a result of ACS's unlawful acts, and to account for all gains, profits and advantages derived by ACS from the same and awarding such amount to KDS;

E.     For disgorgement of ACS's profits under 15 U.S.C. § 1117(a);

F.     For an order from the Court that an asset freeze or constructive trust be imposed over all monies and profits in ACS's possession which rightfully belong to KDS;

G.     An award of such damages KDS suffered as a consequence of ACS's unlawful acts, and, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount pursuant to 15 U.S.C. §1117(a) for each and every trademark that Defendant ACS has infringed;

H.     An order requiring all materials and goods bearing an infringing mark to be delivered to the Court or upon the Court's order to KDS, for impoundment and destruction, and that all electronic versions of the same be identified to KDS and then destroyed, with a written certificate documenting the destruction, and that the Court order ACS to reimburse KDS for any expenses associated with the proper destruction and disposal of such products;

I.     An order requiring ACS to file with this Court, and serve on KDS within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which ACS has complied with the injunction;

J.     A finding that this case is an exceptional one under 15 U.S.C. §1116 and awarding reasonable attorney's fees and investigators' fees to KDS;

K.     An order awarding KDS pre-judgment and post-judgment interest;

L.     An Order that, pursuant to 11 U.S.C.S. § 523(a)(6), ACS be prohibited from a discharge under 11 U.S.C.S. § 727 for malicious, willful and fraudulent injury to KDS;

M.      Directing that this Court retain jurisdiction of this action for the purpose of enabling KDS to apply to the Court at any time for such further orders and interpretation or execution of any order entered in this action, for the modification of any such order, for the enforcement or compliance therewith and for the punishment of any violations thereof; and

N.      Awarding to KDS such other and further relief as the Court may deem just and proper, in law or in equity, together with the costs and disbursements which KDS has incurred in connection with this action.

Dated:  May 23, 2018                              Respectfully submitted,

                                                  ADAIR MYERS GRAVES STEVENSON, PLLC

                                                      /s/ *Gordon G. Waggett*
                                              By:   _____
                                                    Gordon G. Waggett
                                                    Attorney-in-Charge
                                                    Texas Bar No. 20651700
                                                    S.D. Texas Bar No. 3214
                                                    Email:  ggw@am-law.com
                                                    D:  (713) 961-4641
                                                    Christopher A. Stevenson
                                                    Texas Bar No. 24056381
                                                    S.D. Texas Bar No. 685207
                                                    Email: cas@am-law.com
                                                    Courtney C. Baker
                                                    Texas Bar No. 24026683
                                                    S.D. Texas Bar No. 435386
                                                    Email: cb@am-law.com
                                                    3120 Southwest Freeway, Suite 320
                                                    Houston, Texas 77098
                                                    O:  (713) 522-2270
                                                    F:  (713) 522-3322

                                                  **ATTORNEYS FOR PLAINTIFF KDS**

41

## **VERIFICATION**

Dat Vinh Ma d/b/a KDS Nail Products, under penalty of perjury of the laws of the United States, states: That he is the Plaintiff in this suit, that he has read, is familiar with, and has personal knowledge of the contents of the foregoing Plaintiff's Original Verified Complaint And Request For Injunctive Relief, and that to the best of his knowledge, information, and belief the allegations thereof are true and correct, and where made on information and belief, are believed to be true and correct.

Executed this __/8__ day of May 2018, at Sacramento, California

_____
Dat Vinh Ma a/k/a Daniel Ma

42